IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 23-cv-02651-NYW-SBP

PROKASRO SERVICES USA, INC.,

     Plaintiff,

v.

DHL EXPRESS (USA), INC. d/b/a DHL EXPRESS,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion for Summary Judgment"), [Doc. 30], and DHL Network Operations (USA), Inc.'s Motion for Summary Judgment ("Defendant's Motion for Summary Judgment"), [Doc. 31]. The Court has reviewed the Motions and concludes that oral argument would not materially assist in their resolution. For the reasons herein, Plaintiff's Motion for Summary Judgment is respectfully **GRANTED in part** and **DENIED in part** and Defendant's Motion for Summary Judgment is respectfully **DENIED**.

### BACKGROUND

In 2023, Plaintiff ProKASRO Services USA, Inc. ("Plaintiff" or "ProKASRO"), through a third party, hired Defendant DHL Express (USA), Inc. ("Defendant" or "DHL")[1] to ship Plaintiff's robotics equipment from Denver, Colorado to Bogotá, Colombia. [Doc.

---

[1] Defendant identifies itself as "DHL Network Operations (USA), Inc." and states that it is "improperly designed [sic] as DHL Express (USA), Inc. d/b/a DHL Express." [Doc. 31 at 1]. To the extent Defendant is not properly named, one or both of the Parties must file a motion to amend the case caption after conferral.

1 at ¶¶ 6–10].   After the equipment was delivered to DHL but before it was moved, ProKASRO canceled the shipment, directed DHL to not ship the equipment to Bogotá, and asked that the shipment be held in Denver.   [*Id.* at ¶¶ 13–18, 27–30].   However, the shipment was nevertheless sent to Bogotá, was seized by Colombian authorities, and is considered lost.   [*Id.* at ¶¶ 34–35, 37, 66].

ProKASRO initiated this action against DHL on October 11, 2023.   *See generally* [*id.*].   It asserts four claims:  (1) negligence; (2) conversion; (3) civil theft under Colo. Rev. Stat. § 18-4-405; and (4) a "fourth alternative claim for relief" under the Warsaw Convention.   [*Id.* at ¶¶ 40–66].   Both Parties have filed motions seeking partial summary judgment in their favor.   *See* [Doc. 30; Doc. 31].   These Motions are ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.   A fact is material if under the substantive law it is essential to the proper disposition of the claim."   *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (cleaned up).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard," *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019), and "the denial of one does not require the grant of another," *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). However, the burden at summary judgment slightly differs depending on which party bears the ultimate burden at trial.   A movant that does not bear the ultimate burden of

persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). But "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.* When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank*, 916 F.3d at 1326.

## UNDISPUTED MATERIAL FACTS

These undisputed material facts are drawn from the summary judgment record:

1.    In 2023, Plaintiff planned to exhibit its equipment at a convention in Bogotá, Colombia, and contracted with third party TQL Global, LLC ("TQL") to broker the shipment from Denver to Bogotá. [Doc. 37 at ¶¶ 2, 4;[2] Doc. 39 at ¶ 1;[3] Doc. 37-1 at ¶¶ 4, 6].

---

[2] Unless otherwise noted, all citations to facts contained in Plaintiff's Response reference the assertions in Plaintiff's Statement of Additional Undisputed Material Facts. [Doc. 37 at 3–7].

[3] Defendant "does not take issue with any of the additional undisputed material facts raised by Plaintiff" in Plaintiff's Response to Defendant's Motion for Summary Judgment. [Doc. 39 at ¶ 1]. Accordingly, the Court deems all facts in Plaintiff's Statement of Additional Undisputed Facts, *see* [Doc. 37 at ¶¶ 1–33], undisputed.

2.      TQL hired DHL to transport the equipment from Denver to Colombia.  [Doc. 37 at ¶ 5; Doc. 39 at ¶ 1; Doc. 37-1 at ¶ 7].

3.      On April 27, 2023, TQL delivered Plaintiff's equipment (the "Cargo") to DHL, with tracking records showing that DHL received the Cargo at 3:47 p.m. that day.  [Doc. 37 at ¶¶ 7–8; Doc. 39 at ¶ 1; Doc. 37-1 at ¶ 9].

4.      DHL scheduled the shipment to transport the Cargo from Denver, Colorado to Cincinnati, Ohio; from Cincinnati to Miami, Florida; and from Miami to Bogotá, Colombia.  [Doc. 37 at ¶ 9; Doc. 39 at ¶ 1; Doc. 37-2 at 1].

5.      The same day DHL received the Cargo, ProKASRO directed TQL to *not* ship the Cargo, as it had learned that there would be no one to retrieve the Cargo once it arrived in Colombia.  [Doc. 37 at ¶ 10; Doc. 39 at ¶ 1; Doc. 37-1 at ¶ 10].  TQL emailed DHL that "[t]he customer canceled and we need to cancel this booking."  [Doc. 37 at ¶ 11; Doc. 39 at ¶ 1; Doc. 37-3 at 10].  In a separate email, TQL told DHL:  "Confirming this booking is cancelled.  This can not [sic] fly to [Bogotá].  Please confirm and we will send a truck in to pick up the [C]argo."  [Doc. 37 at ¶ 13; Doc. 39 at ¶ 1; Doc. 37-3 at 10].

6.      DHL responded:  "Cargo is not showing checked in but if you dropped it, please pick up immediately.  We have cancelled in the systems."  [Doc. 37 at ¶ 14; Doc. 39 at ¶ 1; Doc. 37-3 at 10].

7.      The Cargo was nevertheless moved overnight from Denver to Cincinnati. [Doc. 37 at ¶¶ 13, 15; Doc. 39 at ¶ 1; Doc. 21 at 3].  On April 28, the Cargo was moved from Cincinnati to Miami.  [Doc. 37 at ¶ 13; Doc. 39 at ¶ 1; Doc. 21 at 3].

8.      On April 28, DHL emailed TQL:  "Kindly note shipment moved [Denver to Cincinnati to Miami] on 28th as per below.  We are still pending revised flight details ex

[Miami] into [Bogotá]." [Doc. 37 at ¶ 18; Doc. 39 at ¶ 1; Doc. 37-3 at 11]. TQL responded: "Please note we cancelled this booking yesterday as the shipment can not [sic] be exported to [Bogotá]. Please hold this load at [Cincinnati]. Also, can we get this back to [Denver]?" [Doc. 37 at ¶ 19; Doc. 39 at ¶ 1; Doc. 37-3 at 11]. DHL replied, "Thank you for the information [sic] we will share with our team then get back to you." [Doc. 37 at ¶ 20; Doc. 39 at ¶ 1; Doc. 37-3 at 11].

9.    Later, TQL emailed DHL: "We urgently need an update. This [C]argo cannot be exported to [Bogotá]. Kindly confirm the schedule back to [Denver]." [Doc. 37 at ¶ 21; Doc. 39 at ¶ 1; Doc. 37-3 at 11]. DHL replied that the "[s]hipment is placed on hold and they are working on getting it returned back to [Denver]. Will advise once I have more updates." [Doc. 37 at ¶ 22; Doc. 39 at ¶ 1; Doc. 37-3 at 11–12].

10.    DHL moved the Cargo from Miami back to Cincinnati, but the Cargo's destination was still incorrectly designated as Bogotá. [Doc. 37 at ¶ 23; Doc. 39 at ¶ 1; Doc. 21 at 3].

11.    Because the Cargo's destination was erroneously designated as Bogotá, DHL transported the Cargo back to Miami on April 30, 2023. [Doc. 37 at ¶ 23; Doc. 39 at ¶ 1; Doc. 21 at 3].

12.    DHL transported the Cargo from Miami to Bogotá on May 1, 2023. [Doc. 37 at ¶ 25; Doc. 39 at ¶ 1; Doc. 37-3 at 12].

13.    DHL did not have ProKASRO's consent to ship the Cargo outside of the United States. [Doc. 37 at ¶ 26; Doc. 39 at ¶ 1; Doc. 37-1 at ¶ 12].

14.    The Cargo is in the possession of "Colombian authorities" and is deemed lost by the Parties. [Doc. 37 at ¶ 27; Doc. 39 at ¶ 1; Doc. 37-1 at ¶ 13].

15.    The loss of the Cargo "was the result of a failure in DHL's internal flagging process for shipments."  [Doc. 37 at ¶ 33; Doc. 39 at ¶ 1; Doc. 37-3 at 6; Doc. 21 at 3].

## ANALYSIS

Both Parties move for partial summary judgment in their favor.  ProKASRO seeks summary judgment in its favor on its negligence and conversion claims.  [Doc. 30 at 2].  DHL, meanwhile, argues that Plaintiff's state-law claims are preempted by The Convention for the Unification of Certain Rules for International Carriage by Air (the "Montreal Convention"), the Airline Deregulation Act ("ADA"), and the Federal Aviation Administration Authorization Act ("FAAAA"), and argues it is entitled to summary judgment on those three claims as a result.  [Doc. 31 at 4–10].  In the alternative, Defendant contends that it is entitled to summary judgment on Plaintiff's civil theft claim.  [*Id.* at 10–11].  Because Defendant's preemption arguments, if successful, would alleviate any need to consider the merits of Plaintiff's state claims, the Court addresses those threshold arguments first.

## I.    Preemption

### A.    Whether Defendant's Preemption Defense Was Waived

Before discussing the substance of preemption, the Court must first address a procedural issue:  Plaintiff contends that the Court should disregard DHL's preemption arguments because Defendant failed to raise preemption as an affirmative defense in its Answer.  [Doc. 37 at 7].  In its Reply, Defendant first contends that "there was no need for DHL to raise [preemption] as an affirmative defense" because Plaintiff's fourth claim

seeks relief under the Warsaw Convention, [Doc. 39 at 2],[4] such that Plaintiff was on notice that Defendant would raise the preemption defense, [*id.* at 2–3]. DHL asserts that requiring Defendant to raise all of its affirmative defenses in its Answer "would be ridiculous under the circumstances." [*Id.* at 3]. In the alternative, it asks the Court for leave to amend its Answer to add preemption as an affirmative defense. [*Id.* at 3–4].

The Court respectfully disagrees with DHL's argument that it was not required to include all of its affirmative defenses in its pleading because Plaintiff could have or should have assumed that Defendant would raise such a defense. The Federal Rules expressly require defendants to include their affirmative defenses in their answer: "[i]n responding to a pleading, a party *must* affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1) (emphasis added). "The general rule is that a party waives its right to raise an affirmative defense at trial when the party fails to raise the defense in its pleadings." *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009). While there are some exceptions to this rule, *see Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1083 (D.N.M. 2021) (collecting cases), Defendant cites no authority recognizing an exception applicable to this case, *see generally* [Doc. 39]. Moreover, Plaintiff's decision to plead an alternative claim under the Warsaw Convention does not alone provide Plaintiff notice that Defendant would take the position that Plaintiff's state-

---

[4] The Warsaw Convention is the predecessor of the Montreal Convention. *See Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co.*, 522 F.3d 776, 779–81 (7th Cir. 2008). The Montreal Convention "was the product of a United Nations effort to reform the Warsaw Convention 'so as to harmonize the hodgepodge of supplementary amendments and intercarrier agreements of which the Warsaw Convention system of liability consists.'" *Id.* at 780 (quoting *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004)). The Montreal Convention did not amend the Warsaw Convention; rather, it is "an entirely new treaty that . . . replaces the system of liability that derives from the Warsaw Convention." *Ehrlich*, 360 F.3d at 371 n.4.

law claims fall within the scope of the Montreal Convention.  Nor does it provide any notice with respect to Defendant's other preemption arguments under the ADA or FAAAA.

Nevertheless, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") prefers deciding cases on the merits, rather than procedural deficiencies.  *See United States ex rel. Precision Co. v. Koch Indus.*, 31 F.3d 1015, 1018 (10th Cir. 1994) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." (quotation omitted)).  And if a party fails to affirmatively move to amend, "a district court may allow the party to 'constructively' amend" the answer, "such as by raising an affirmative defense in a motion for summary judgment." *Sky Harbor Air Serv., Inc. v. Reams*, 491 F. App'x 875, 884 (10th Cir. 2012) (quoting *Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006)).  To decide whether constructive amendment is proper, courts consider whether the opposing party will be prejudiced and whether there was undue delay, bad faith, or dilatory motive, with prejudice being "[a] primary consideration." *Id.*

Though DHL did delay raising its preemption affirmative defense, the Court does not find any indication of bad faith or dilatory motive on the part of DHL.  Most importantly, the Court does not find that Plaintiff would be prejudiced by constructive amendment, which is the Court's "primary consideration." *Id.*  This is not a case where, for example, the defendant is attempting to assert a new affirmative defense that would shift the factual focus of the case and would require the Court to reopen discovery.  Instead, the newly raised defense asserts a legal question—whether Plaintiff's state-law claims are preempted by the Montreal Convention or federal statute.  Under these circumstances,

the Court will permit constructive amendment. *See Razo v. Jefferson Capitalsystems LLC*, No. 2:23-cv-00183-DAK-CMR, 2024 WL 4519174, at *3 (D. Utah Oct. 17, 2024) (permitting defendant to assert claim preclusion defense on summary judgment because, inter alia, "[n]o discovery [wa]s needed to address and decide the legal issue presented"); *see also Ahmad*, 435 F.3d at 1204.

### B.    Preemption Under the Montreal Convention

The Montreal Convention, to which the United States and Colombia are both signatories, *see* [Doc. 31-2 at 2, 4], "is a multilateral treaty governing the liability of air carriers for certain injuries and damages that occur during international air carriage," *Moore v. Brit. Airways PLC*, 32 F.4th 110, 114 (1st Cir. 2022);[5] *see also* Montreal Convention, art. 1, ¶ 1 ("This Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward."). The purpose of the Montreal Convention, which "creates a private right of action in U.S. courts," *Baah v. Virgin Atl. Airways Ltd.*, 473 F. Supp. 2d 591, 593 (S.D.N.Y. 2007), is to "achieve uniformity of rules governing claims arising from international air transportation," *Pettaway v. Miami Air Int'l, Inc.*, 624 F. Supp. 3d 1268, 1276 (M.D. Fla. 2022) (quotation omitted). To that end, the Montreal Convention contains a preemption provision, stating in relevant part that:

> In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights.

---

[5] The Parties do not cite any Tenth Circuit authority discussing the Montreal Convention, and the Court could not locate any. Accordingly, the Court looks to persuasive guidance from other circuit courts.

Montreal Convention, art. 29.   In this article, "the Montreal Convention provides the exclusive remedy for claims within its scope." *We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 303 (4th Cir. 2024).  A claim falls within the Convention's "scope" if it "falls within one of the Montreal Convention's three damage provisions."  *Id.* (quoting *Badar v. Swissport USA, Inc.*, 53 F.4th 739, 744 (2d Cir. 2022)).  Relevant here, Article 18 of the Montreal Convention provides that a carrier is "liable for damage sustained in the event of the destruction or loss of, or damage to, cargo upon condition only that the event which caused the damage so sustained took place during the carriage by air."   Montreal Convention, art. 18, ¶ 1.  "Carriage by air" is defined as the "period during which the cargo is in the charge of the carrier," *id.* at ¶ 3, which "can encompass periods when the cargo is not 'actually aboard an airplane,'" *Indem. Ins. Co. of N. Am. v. Unitrans Int'l Corp.*, 98 F.4th 73, 78 (2d Cir. 2024) (quoting *Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1040 (11th Cir. 2018)).

Defendant argues that Plaintiff's claims of negligence, conversion, and civil theft are preempted by Articles 18 and 29 of the Montreal Convention. [Doc. 31 at 4–6].  Aside from discussing a brief history of the Montreal Convention and quoting the relevant provisions, however, Defendant's argument is somewhat limited in development.  *See* [*id.*].  Plaintiff counters that the Montreal Convention does not preempt its claims. [Doc. 37 at 8].  It first asserts that "DHL has failed to set forth facts demonstrating that the loss of the Cargo occurred when it was in [DHL's] charge," such that the loss of the Cargo did not occur during "carriage by air" as defined in the Montreal Convention.  [*Id.*].  In the alternative, Plaintiff contends that the Montreal Convention does not apply because after it exercised its right to withdraw the Cargo and request that it be held in (or returned to)

Denver, the shipment was no longer "international" and was no longer within the scope of the Montreal Convention. [*Id.*].

### 1. The Loss of the Cargo

Plaintiff first asserts that Defendant has not demonstrated that the Montreal Convention applies to Plaintiff's claims because Defendant has not set forth undisputed facts demonstrating that the Cargo was lost when it was in the "charge of the carrier" (and thus, during "carriage by air"). [*Id.*]. According to Plaintiff, "the loss of the Cargo here resulted from its confiscation by the Colombian authorities following DHL's negligent and unauthorized shipment to Colombia" because "the loss of the Cargo itself, while caused by DHL, actually occurred when it could not be retrieved from the Colombian authorities subsequent to [the Cargo's] arrival." [*Id.* at 8–9]. Defendant responds by directing the Court to paragraph 4 of Article 18, which provides that if carriage by land, sea, or inland waterway "takes place in the performance of a contract for carriage by air, for the purpose of loading, delivery, or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the carriage by air." Montreal Convention, art. 18, ¶ 4; *see also* [Doc. 39 at 5]. Defendant contends that, based on this language, "it is presumed the carrier [sic] took place by air to the extent delivery is an involved issue in the performance of the contract." [Doc. 39 at 5].

Neither Party's argument is entirely on point. "Article 18 creates liability on the carrier 'upon condition only that *the event which caused the damage* so sustained took place during the carriage by air.'" *We CBD, LLC*, 109 F.4th at 306 (quoting Montreal Convention, art. 18, ¶ 1). "The plain language of Article 18 makes it apparent that 'the event' must occur during the carriage by air — not the damage" (or the loss). *Id.*

(collecting cases). To determine whether a claim falls within the scope of the Montreal Convention, courts look at "the total circumstances," which includes an assessment of "the spatial and temporal proximity of and the causal connection between the events giving rise to the claim." *Id.* at 303 (quoting *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 873 (9th Cir. 2010)). The Fourth Circuit has eschewed an "overly segmented approach in identifying the relevant causal event," as such an approach "'neglects the reality that there are often multiple interrelated factual events that combine to cause any given injury,' and 'the very fact that multiple events will necessarily combine and interrelate to cause any particular injury makes it difficult to define, in any coherent or non-question-begging way, any single event as *the* injury producing event.'" *Id.* at 304 (quoting *Olympic Airways v. Husain*, 540 U.S. 644, 653 (2004)). The Court finds this rationale persuasive and adopts it here.

It is undisputed[6] that the Cargo came into DHL's possession on April 27, 2023 and was to be transported to Bogotá, Colombia. [Doc. 37 at ¶¶ 4–5, 7]. Plaintiff directed DHL to hold the shipment, but the Cargo was erroneously shipped to Cincinnati, then to Miami, and back to Cincinnati. [*Id.* at ¶¶ 10, 15–16, 23]. But when the Cargo was sent back to Cincinnati, "it was still incorrectly flagged as destination Bogot[á], Colombia." [*Id.* at ¶ 23]. The Cargo was then shipped back to Miami "as a result of the shortfall on DHL's flagging." [*Id.* at ¶ 24]. And notably, it is undisputed that "[t]he loss of the Cargo *was the result of* a failure in DHL's internal flagging process for shipments." [*Id.* at ¶ 33 (emphasis added)].

---

[6] With respect to Plaintiff's criticism that DHL fails to put forth facts demonstrating that the Cargo was lost in DHL's charge, *see* [Doc. 37 at 8–9], the Court notes that Plaintiff's Response includes 33 additional undisputed facts, *see* [*id.* at 3–7]. The Court may consider these undisputed facts in ruling on Defendant's Motion for Summary Judgment.

Based on these undisputed facts, the Court finds that the event that caused the Cargo's loss was DHL's failure to correct the Cargo's intended destination in its internal flagging system. And it is not disputed that this flagging failure occurred when the Cargo was in DHL's possession, i.e., when the Cargo was "in the charge of the carrier." Montreal Convention, art. 18, ¶ 3. It thus follows that the loss of the Cargo was caused by an event "during the carriage by air." *Id.* at ¶ 1; *see also We CBD, LLC*, 109 F.4th at 304–07 (determining, as a matter of law, whether the plaintiff's claims arose from events that occurred during carriage by air).

The Court is respectfully unpersuaded by Plaintiff's arguments to the contrary, which focus on when, in Plaintiff's view, "the loss of the Cargo . . . actually occurred." [Doc. 37 at 9]. As mentioned above, the relevant question is whether the *event* that caused the loss occurred during carriage by air. *We CBD, LLC*, 109 F.4th at 306. Here, it is undisputed that the loss was caused by DHL's internal flagging failure, and Plaintiff does not argue that there was any sort of break in the causal chain between the flagging failure and the confiscation of the Cargo. And to the extent Plaintiff argues that "[a]t the very least, there remains a genuine issue of material fact as to th[e] exact sequence of events" after the Cargo was left in Bogotá, [Doc. 37 at 9], its Response identifies no such disputed facts, *see* [*id.* at 3–7]. Accordingly, the Court is respectfully unpersuaded by Plaintiff's argument that the loss of the Cargo was not sustained during "carriage by air."

### 2. International Carriage

In the alternative, Plaintiff directs the Court to Article 12 of the Montreal Convention, which provides:

> Subject to its liability to carry out all its obligations under the contract of carriage, the consignor [i.e., the shipper] has the right to dispose of the

cargo by withdrawing it at the airport of departure or destination, or by stopping it in the course of the journey on any landing, or by calling for it to be delivered at the place of destination or in the course of the journey to a person other than the consignee originally designated, or by requiring it to be returned to the airport of departure.  The consignor must not exercise this right in such a way as to prejudice the carrier or other consignors and must reimburse any expenses occasioned by the exercise of this right.

Montreal Convention, art. 12, ¶ 1.  Plaintiff argues that it expressly exercised this right when it directed DHL to not ship the Cargo to Bogotá and requested that it be held in or returned to Denver.  [Doc. 37 at 9].  It contends that, because the air waybill[7] was canceled and the Parties agreed to return the Cargo to Denver, "th[e] shipment was no longer international and thus no longer subject to the Montreal Convention."  [*Id.* at 10].  In its Reply, DHL contends that Article 12 "does not make the Convention inapplicable to the shipment, but simply bestows the right of disposition of the shipper to stop the carriage," and "[b]y its inclusion in the Convention, Article 12 . . . makes instances in which the shipper requests disposition of the Cargo outside of the original Waybill governed by the Convention."  [Doc. 39 at 5–6].

The Court does not necessarily disagree with Defendant's argument in a general sense—that Article 12 does not, by its plain terms, render the Montreal Convention inapplicable when a shipper exercises its right to withdraw a shipment.  But Defendant does not engage with the heart of Plaintiff's argument—that the *consequence* of Plaintiff's directive was that the agreed-upon shipment was no longer international, and thus no longer subject to the confines of the Montreal Convention.

---

[7] An air waybill is a "document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods [by air]," and typically records the shipped property's route, value, and weight.  *Indem. Ins. Co.*, 98 F.4th at 76 n.2 (quoting *Waybill*, Black's Law Dictionary (11th ed. 2019)).

The Montreal Convention "applies to all *international* carriage of persons, baggage or cargo performed by aircraft for reward."  Montreal Convention, art. 1, ¶ 1 (emphasis added).  "International carriage" means

> any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transshipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State.

*Id*. ¶ 2.  It does *not* include "[c]arriage between two points within the territory of a single State Party without an agreed stopping place within the territory of another State."  *Id.*

Here, it is undisputed that, before the Cargo left Denver (i.e., before any "carriage"), Plaintiff instructed DHL to cancel the shipment to Bogotá.  [Doc. 37 at ¶¶ 10–11, 13].  DHL confirmed to TQL that the booking was canceled and asked TQL to pick up the Cargo.  [*Id.* at ¶ 14].  At this point, then, there was no "agreement between the parties" to ship the Cargo between the territories of two State Parties.  *See* Montreal Convention, art. 1, ¶ 2.  Rather, the Parties agreed that the Cargo would *not* be shipped to Bogotá. Indeed, it is undisputed that the Cargo was shipped to Bogotá *without* Plaintiff's consent. *See* [Doc. 37 at ¶ 26].

Once the Cargo was shipped to Cincinnati and then Miami, TQL emailed DHL, reiterating that "the shipment [cannot] be exported" to Bogotá, asking that the Cargo be held in Cincinnati, and asking if the Cargo could be shipped back to Denver.  [*Id.* at ¶¶ 19, 21].  DHL confirmed that the shipment was placed on hold and that "they [were] working on getting it returned back to" Denver.  [*Id.* at ¶ 22]  At this point, the only agreement between the Parties was that the Cargo would be shipped "between two points within the

territory of a single State Party," and there was no "agreed stopping place within the territory of another State."  Montreal Convention, art. 1, ¶ 2.

The Court could not locate any similar cases in its research of these issues, and the Parties do not cite any, either.  But in the Court's view, the plain language of the Montreal Convention is sufficient to answer the question before the Court.  At the time of the events giving rise to this case, there was no operative agreement between the Parties to ship the Cargo from Denver to Bogotá, but only an agreement to ship the Cargo within the United States.  In other words, the carriage was not one in which "the place of departure and the place of destination . . . are situated . . . within the territories of two States Parties" and was not "international" as contemplated by the Montreal Convention.  Montreal Convention, art. 1, ¶ 2.  And even if the shipment could be deemed international because the Cargo was, albeit erroneously, sent to Bogotá, that carriage was not "according to the agreement between the parties," *id.*, as Plaintiff directed DHL to keep the Cargo in the United States (and DHL agreed).  For these reasons, the Montreal Convention does not apply to Plaintiff's claims.  *See id.* at ¶ 1 ("This Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward."); *cf. Salinas Asphalt, Inc. v. Expeditors Int'l (Puerto Rico), Inc.*, No. 3:10-cv-01247-DRD, 2011 WL 13350173, at *3 (D.P.R. Mar. 18, 2011) (concluding that shipment that was intended to be from Atlanta, Georgia to San Juan, Puerto Rico, but was mistakenly sent to San Jose, Costa Rica, was not "international carriage" because the "shipment of the cargo to San Jose was a mistake and . . . was intended to be domestic cargo in transit from Atlanta to San Juan," such that "the agreement between the parties

in fact did not contemplate an international stop for the cargo").  As a result, the Montreal Convention does not preempt Plaintiff's state claims.

### C.    Federal Law Preemption

In the alternative, Defendant contends that Plaintiff's negligence, conversion, and civil theft claims are preempted by the ADA and the FAAAA.  [Doc. 31 at 7].

"To determine whether a state law is expressly preempted by a federal preemption clause," courts "apply ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute."  *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022) (quotation omitted).  The ADA states, in pertinent part, that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b)(1).  The FAAAA contains a similar preemption provision, precluding any state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."  *Id.* § 14501(c)(1).  Common-law rules, which have "the force and effect of law," may fall within these preemption provisions.  *See Nw., Inc. v. Ginsberg*, 572 U.S. 273, 281 (2014) (concluding that common-law claims "f[ell] comfortably within" a similar ADA preemption provision);[8] *Day*, 45 F.4th at 1184 (applying *Ginsberg* to argument under § 41713(b)(1)).

---

[8] "The FAAAA's preemption provision is in pertinent part identical to the preemption provision of the ADA and is generally construed in pari materia."  *Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 454 n.4 (1st Cir. 2014) (citing *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013), and *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)); *see also Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1267 n.2 (11th Cir.

DHL argues that the ADA and FAAAA "preempt any state law claims that relate to DHL's rates, routes and services."  [Doc. 31 at 8].  But DHL's argument is remarkably limited in case-specific analysis, focusing instead on the breadth of the meaning assigned to the statutes' "related to" language, without meaningfully explaining why any of Plaintiff's specific claims are related to DHL's price, route, or service.  [*Id.* at 8–10].  It concludes that, "[b]ased upon the foregoing authorities" it cites discussing the ADA and FAAAA generally, Plaintiff's claims "must be dismissed pursuant to the ADA and the FAAAA's express preemption provisions."  [*Id.* at 10].  Plaintiff disagrees that its state claims are preempted by federal law, arguing that the claims "fall outside the scope of preemption because they relate directly to DHL's own undertakings specific to this transaction," as DHL undertook a duty to safeguard the Cargo and breached that duty.  [Doc. 37 at 11].

For the reasons set forth below, the Court concludes that DHL has not met its burden at summary judgment to demonstrate that Plaintiff's state claims are preempted by the ADA or the FAAAA.

A recent Tenth Circuit decision sets out in great detail the applicable framework for ADA preemption arguments, and specifically for common laws of general applicability, like negligence.  *See Day*, 45 F.4th at 1184–90.  The overarching principle is simple:  the ADA preempts state claims "having a connection with, or reference to, airline 'rates, routes, or services.'"[9]  *Id.* at 1185 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S.

---

2023) (looking to ADA cases to "guide [the] analysis of the FAAAA's preemption provision").  Accordingly, the Court applies the same analysis to preemption under the ADA and the FAAAA.

[9] "The ADA originally referred to 'rates, routes, or services,' but Congress amended this statutory language in 1994 to refer to 'a price, route, or service.'"  *Day*, 45 F.4th at 1185.  "Because Congress intended this amendment to be without substantive change, courts refer to the two versions interchangeably."  *Id.* (quotation omitted).

374, 384 (1992)).  Drawing guidance from ERISA cases, which the Supreme Court has applied to ADA preemption, *see Morales*, 504 U.S. at 384, the Tenth Circuit explained that "a state law has an impermissible 'reference to' airline prices, routes, or services if the law 'acts immediately and exclusively' upon airline prices, routes, or services, or if 'the existence of' airline prices, routes, or services 'is essential to the law's operations,'" *Day*, 45 F.4th at 1186 (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319–20 (2016)). And a state law is "connected with" prices, routes, or services "if the law (1) governs a central matter of an airline's prices, routes, or services; (2) interferes with uniform national policies regarding airline prices, routes, or services; or (3) will have acute economic effects that effectively limit airlines' choices regarding their prices, routes, and services." *Id.* (citing *Gobielle*, 577 U.S. at 319–20).  In evaluating whether a state law is so connected, courts consider "(1) the objectives of the ADA as a guide to the scope of the state law that Congress understood would survive, and (2) the nature of the effect of the state law on airline prices, routes, and services."  *Id.* (cleaned up).

The party claiming preemption—here, DHL—"bears the burden of showing with specificity that Congress intended to preempt state law."  *Id.* at 1184 (quoting *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 n.4 (10th Cir. 1998)).  At summary judgment, this means that DHL must satisfy the Court that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But here, Defendant does not make any argument using the applicable standards outlined in *Day* or otherwise explaining, with specificity, why each of Plaintiff's separate claims is preempted by the ADA or FAAAA.  Defendant's general arguments are insufficient to demonstrate its entitlement to summary judgment on preemption grounds.  *See Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1270 n.15

19

(10th Cir. 2022) (declining to consider "arguments . . . presented in a conclusory manner
without factual and legal development"); *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir.
2014) (where the plaintiff failed to explain her argument, declining to construct an
argument for her).

For purposes of completeness, even setting aside Defendant's lack of argument,
the Court cannot conclude that the ADA or FAAAA preempt any of Plaintiff's state law
claims. First, considering whether the common law rules for negligence or conversion
have a "reference to" carrier prices, routes, or services, the Court finds that they do not.
These causes of action "are laws of general applicability that apply to any individuals or
corporations whose actions may foreseeably injure others." *Day*, 45 F.4th at 1186. They
do not reference prices, routes, or services "because they do not act immediately and
exclusively upon airline prices, routes, or services, nor do they depend on the existence
of airline prices, routes, or services for their operation." *Id.* at 1187. Similarly, Colorado's
civil theft statute does not reference, act immediately on, or depend on the existence of
carrier prices, routes, or services. *See* Colo. Rev. Stat. § 18-4-405.

Nor does DHL demonstrate that the relevant state laws have a "connection with"
prices, routes, or services, which requires consideration of "(1) the objectives of the ADA,
which provide a guide to the scope of the state law that Congress understood would
survive, and (2) the nature of the effect of the state law on airline prices, routes, and
services." *Day*, 45 F.4th at 1187 (quotation omitted). At best, DHL argues that Congress
intended the ADA and FAAAA to "free carriers like DHL from the restrictive legal regimes
that had previously regulated them" and to "deregulate the industry." [Doc. 31 at 8]. But
as the Tenth Circuit has recognized, "Congress enacted the ADA to achieve 'the

*economic* deregulation of the airline industry,' but '[n]othing in the Act itself, or its legislative history, indicates that Congress had a clear and manifest purpose to displace state tort law in actions that do not affect deregulation in more than a peripheral manner.'" *Day*, 45 F.4th at 1187 (collecting cases) (quoting *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998) (en banc) (alteration in original)). "Congress's silence regarding the ADA's potential displacement of state tort laws 'takes on added significance in light of Congress's failure to provide any federal remedy for [plaintiffs] injured by such conduct,' because it 'is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.'" *Id.* (quoting *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 338 (5th Cir. 1995) (en banc)). And Defendant does not argue that judgment in Plaintiff's favor would impact DHL's prices, routes, or services. *See id.* Rather, the rules underlying Plaintiff's claims "are akin to generally applicable background regulations that are several steps removed from prices, routes, or services, . . . which are not preempted, even if [carriers] must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide." *Id.* at 1188 (cleaned up).

"[N]othing in the ADA or its legislative history supports the view that Congress . . . intended to immunize airlines from liability for any violations of generally applicable negligence or [conversion] laws" or Colorado's civil theft statute. *Id.* at 1189. DHL has not demonstrated that Plaintiff's common law claims are preempted by the ADA or

FAAAA. Accordingly, to the extent Defendant argues that Plaintiff's state claims are preempted, Defendant's Motion for Summary Judgment is respectfully **DENIED**.[10]

## II.     Plaintiff's State Claims

Having concluded that Plaintiff's claims are not preempted, the Court turns to the Parties' arguments in favor of summary judgment on Plaintiff's various claims. Defendant argues that it is entitled to summary judgment on Plaintiff's civil theft claim, [Doc. 31 at 9–10], and Plaintiff asks the Court to enter judgment in its favor on its negligence and conversion claims, [Doc. 30 at 7–10].

### A.     Civil Theft

"To prove a claim of civil theft, a plaintiff must establish that a defendant (1) knowingly obtained, retained, or exercised control over anything of value of another without authorization; and (2) intentionally or knowingly deprived the other person

---

[10] In its Reply, Defendant criticizes Plaintiff for "not address[ing] the provisions of the [waybill] or the tariffs maintained by Defendant at the time of the carriage," [Doc. 39 at 6], and argues for the first time that even if the Montreal Convention is not applicable, Plaintiff's recovery should be limited by the waybill's terms concerning liability limits, *see* [*id.* at 7 ("Plaintiff makes no argument as to why it should not be bound by the parties['] express terms for carriage to the extent the Montreal Convention is inapplicable.")]. But while Defendant mentions certain waybill provisions in its statement of undisputed facts, *see* [Doc. 31 at ¶¶ 2–4], it does not meaningfully argue in its Motion for Summary Judgment that Plaintiff's liability should be limited pursuant to the terms of the waybill; it only cursorily asserts, in the conclusion of its federal preemption argument, that "Plaintiff's damages should be limited to the Conditions of Contract for which it was fully advised prior to the subject shipment taking place," [*id.* at 10]. This cursory argument is insufficient to adequately raise the issue to the Court or require a response from Plaintiff. *See Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 640 n.3 (10th Cir. 2022). Moreover, Defendant *does not* invoke or reference the waybill provision concerning "carriage to which the Montreal Convention does not apply" until its Reply brief. *Compare* [Doc. 31 at ¶¶ 2–3; *id.* at 10], *with* [Doc. 39 at 6]. Defendant cannot raise new arguments in a reply brief that could have been raised in its affirmative motion. *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) (arguments raised for the first time in a reply are waived).

permanently of the use or benefit of the property." *Million v. Grasse*, 549 P.3d 1043, 1051 (Colo. App. 2024) (citing Colo. Rev. Stat. § 18-4-401(1)).

Defendant argues that it is entitled to summary judgment on Plaintiff's civil theft claim because "there has not been and cannot be a showing by the Plaintiff that Defendant intended to permanently deprive Plaintiff[] of the benefit of [its] property." [Doc. 31 at 10]. It notes that the Cargo is in the possession of Colombian authorities, not DHL, and argues that from May to December 2023, "DHL was actively attempting to get the subject shipment returned to Denver without avail." [*Id.* at 10–11]. It concludes, "[s]imply, there is no intent by anyone, including DHL, to permanently deprive Plaintiff the benefit of the property." [*Id.* at 11].

Plaintiff contests Defendant's characterization of the "intent" element, arguing that intent only requires "proof of a knowing use by the defendant inconsistent with the owner's permanent use and benefit" of the property. [Doc. 37 at 12–13 (quoting *Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009))]. It also notes that "[c]ivil theft can involve a use or an abandonment which results in a permanent deprivation, or a knowing retention more than seventy-two hours after the agreed upon time for return." [*Id.* at 13]. Plaintiff argues that a jury could find that Defendant acted with the requisite intent because DHL knew the Cargo was not to be shipped to Colombia, received instructions to return the Cargo to Denver, and nevertheless shipped the Cargo to Colombia without Plaintiff's consent. [*Id.*]. In its Reply, Defendant contends that there is "[c]learly" no "knowing use" of the Cargo by DHL because the Cargo is still stuck in Colombia, and "[w]hile there is little doubt that Defendant should not have allowed the subject shipment to leave the United States," Plaintiff has not offered evidence "that the

Defendant knowingly intended for the Plaintiff to be permanently deprived of the subject property."  [Doc. 39 at 8].  It also argues that it did not "abandon" the Cargo in Colombia because "[s]tarting in May of 2023 to December of 2023, DHL was actively attempting to get the subject shipment returned to Denver without avail."  [*Id.* at 8–9].

The Court respectfully disagrees that Defendant is entitled to summary judgment on Plaintiff's civil theft claim.   In Colorado, there are "five alternative culpable mental states" that may be sufficient to satisfy the second element of a civil theft claim.  *Franklin Drilling & Blasting Inc. v. Lawrence Constr. Co.*, 463 P.3d 883, 887 (Colo. App. 2018). Specifically, the plaintiff can prevail on a civil theft claim by proving that the defendant:

> (a) Intends to deprive the other person permanently of the use or benefit of the thing of value;
>
> **(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;**
>
> (c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;
>
> (d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person; or
>
> (e) Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement.

*Id.* at 887–88 (emphasis altered) (quoting Colo. Rev. Stat. § 18-4-401(a)–(e)); *see also* Colo. Jury Instr., Civil 32:4 & Notes on Use (noting that, for a civil theft claim, the intent element may be proven if "[t]he defendant knowingly used, concealed, or abandoned the plaintiff's [insert thing of value] in such manner as to permanently deprive the plaintiff of the use or benefit of [insert thing of value]").

Here, Plaintiff has adduced evidence that (1) ProKASRO, through TQL, instructed DHL on multiple occasions to not ship the Cargo to Bogotá and to return the Cargo to Denver, [Doc. 37 at ¶¶ 11, 13, 17, 21]; (2) Plaintiff instructed DHL that the shipment "[could not] be exported" to Bogotá, [*id.* at ¶ 19]; (3) DHL shipped the Cargo to Colombia without ProKASRO's consent, [*id.* at ¶ 26]; and (4) the Cargo is lost, [*id.* at ¶ 27]. Because a jury could conclude that DHL knowingly abandoned the Cargo so as to permanently deprive ProKASRO of its use, summary judgment is not appropriate on Plaintiff's civil theft claim.[11] Defendant's Motion for Summary Judgment is respectfully **DENIED**.

## B.    Negligence

To prevail on its negligence claim, Plaintiff must prove that (1) DHL owed ProKASRO a legal duty; (2) DHL breached that duty; (3) causation; and (4) damages. *Westin Operator, LLC v. Groh*, 347 P.3d 606, 612 (Colo. 2015). Plaintiff seeks judgment in its favor on its negligence claim, arguing that the undisputed facts establish all four elements of the claim. [Doc. 30 at 7]. Defendant does not address this claim on its merits, referring the Court to its preemption arguments that the Court has now rejected. *See generally* [Doc. 36]. However, Defendant's failure to substantively respond does not

---

[11] Defendant's argument that it did not abandon the Cargo because it was "actively attempting to get the subject shipment returned to Denver without avail," [Doc. 31 at 11], does not change the analysis. Because this assertion was not included in Defendant's Statement of Undisputed Material facts, *see* [*id.* at ¶¶ 1–5], such that Plaintiff was not required to admit or deny the assertion, this fact cannot be deemed "undisputed" for purposes of summary judgment. *See* NYW Civ. Practice Standard 7.1D(b)(1), (4) (requiring that "each material fact that the movant believes is not in dispute" be included in the Statement of Undisputed Material Facts section, and also requiring the responding party to "admit or deny the movant's asserted material facts"); *In re HomeAdvisor, Inc. Litig.*, No. 16-cv-01849-PAB-KAS, 2024 WL 4187099, at *6 (D. Colo. Sept. 13, 2024) (declining to consider facts not included in statement of undisputed facts and explaining why this practice "frustrates the summary judgment process"). At best, this assertion demonstrates a dispute of fact that must be resolved at trial.

automatically entitle Plaintiff to judgment in its favor, as a court may only grant summary judgment if "the moving party has met its burden of production and demonstrates that it is legally entitled to judgment under Rule 56." *Altschwager v. Progressive Cas. Ins. Co.*, No. 18-cv-00280-WJM-MEH, 2019 WL 2515404, at *1 (D. Colo. June 18, 2019).

**Duty.**  "Whether a particular defendant owes a legal duty to a particular plaintiff is a question of law."  *W. Innovations, Inc. v. Sonitrol Corp.*, 187 P.3d 1155, 1158 (Colo. App. 2008).  Here, the Parties agree that DHL owed a ProKASRO a duty of care with respect to the Cargo.  [Doc. 30 at ¶ 30; Doc. 36 at ¶ 1].  The Court agrees with the Parties. Based on the undisputed facts, the delivery of the Cargo to DHL was a bailment, i.e., "a delivery of personal property by one person to another in trust for a specific purpose, with an express or implied contract that the property will be returned or accounted for when the specific purpose has been accomplished or when the bailor reclaims the property." *Christensen v. Hoover*, 643 P.2d 525, 528–29 (Colo. 1982).  A "bailee must exercise reasonable care to protect the bailor's property, i.e., that which a person of common prudence would use under the circumstances."  *Id.* at 529.  Accordingly, DHL owed ProKASRO a duty of care with respect to the Cargo.

**Breach, Causation, and Damages.**  Whether a duty was breached is normally a question of fact for the jury.  *Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 412 P.3d 751, 758 (Colo. App. 2015).  Whether the breach caused damage to the plaintiff is a question of fact, too.  *Id.* at 759; *see also Perreira v. Colorado*, 768 P.2d 1198, 1208 (Colo. 1989).

The undisputed facts demonstrate that, after DHL was directed not to ship the Cargo to Colombia and agreed not to ship the Cargo to Colombia, the Cargo remained

"incorrectly flagged" as destined for Colombia. [Doc. 30 at ¶¶ 12, 14, 22–23]. The Cargo
was shipped to Bogotá without Plaintiff's consent and is now lost. [*Id.* at ¶¶ 26–27]. And
it is undisputed that "[t]he loss of the Cargo was the result of a failure in DHL's internal
flagging process for shipments." [*Id.* at ¶ 33]. Defendant does not identify any dispute of
fact that would preclude summary judgment or argue that there are unresolved factual
issues that must be decided by the jury. *See generally* [Doc. 36]. Accordingly, the Court
finds that there are no disputed facts on the first three elements of Plaintiff's negligence
claim. *But see infra* Section II.D.

## C.    Conversion

Conversion is "any distinct, unauthorized act of dominion or ownership exercised
by one person over personal property belonging to another." *Itin v. Ungar*, 17 P.3d 129,
135 n.10 (Colo. 2000). "Unlike civil theft, conversion *does not* require that the converter
act with the specific intent to permanently deprive the owner of his or her property." *Scott
v. Scott*, 428 P.3d 626, 634 (Colo. App. 2018). "A person in lawful possession of property
may commit conversion when he or she refuses the legal owner's demand for return of
the property." *Id.* Plaintiff argues that Defendant engaged in conversion when DHL failed
to comply with Plaintiff's instruction to return the Cargo to Denver and seeks summary
judgment on this claim. *See* [Doc. 30 at 10].

Neither Party sets out what it believes to be the required elements of a conversion
claim. *See* [*id.* at 9–10; Doc. 36]. Colorado courts generally recognize five elements
comprising the claim: (1) the defendant exercised dominion or control over property;
(2) the property belonged to the plaintiff; (3) the defendant's exercise of control was not
authorized; (4) the plaintiff demanded the return of the property; and (5) the defendant

refused.  *See, e.g.*, *Scott*, 428 P.3d at 634; *Colby v. Lundquist*, No. 22CA1913, 2024 WL

3797491, at *8 (Colo. App. Jan. 11, 2024); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint.,*

*Inc.*, 863 F. Supp. 2d 1066, 1081 (D. Colo. 2012); *see also* Colo. Jury Instr., Civil 32:1.

Here, it is undisputed that (1) DHL exercised control over the Cargo, [Doc. 30 at

¶¶ 7, 15–16, 23–25]; (2) the Cargo belonged to ProKASRO, [*id.* at ¶¶ 1–2]; (3) DHL's

shipment of the cargo to Colombia was not authorized, [*id.* at ¶ 26]; (4) DHL demanded

that the Cargo be returned to Denver, [*id.* at ¶¶ 19, 21]; and (5) the Cargo was not returned

to Denver or ProKASRO, [*id.* at ¶ 27].  Again, DHL does not dispute these facts or argue

that any disputed facts preclude summary judgment on Plaintiff's conversion claim.  *See*

*generally* [Doc. 36].  Accordingly, Plaintiff has met its burden at summary judgment with

respect to the basic elements of its conversion claim.  *But see infra* Section II.D.

**D.    Limits on Liability**

Plaintiff seeks judgment in its favor "in the amount of $143,315.84, plus pre- and

post-judgment interest, expenses, costs, and attorneys' fees as may be provided by law,

rule, or statute."  [Doc. 30 at 10–11].  Defendant does not dispute that Plaintiff suffered

damages due to the lost Cargo.  *See generally* [Doc. 36].  It is also undisputed that the

Cargo had a value of $143,315.84.  [Doc. 30 at ¶ 28; Doc. 36 at ¶ 1].  However, DHL does

argue in its opposition to Plaintiff's Motion for Summary Judgment that "Plaintiff's

damages should be limited to the Conditions of Contract [in the waybill] for which it was

fully advised prior to the subject shipment taking place."  [Doc. 36 at 3].  DHL does not

cite to or make arguments about any specific provisions in the waybill that it believes

apply here.  [*Id.*].  And Plaintiff does not respond to Defendant's argument at all in its

Reply.  *See* [Doc. 38].

The waybill states:

If the carriage involves an ultimate destination or stop in a country other than the country of departure, the Montreal Convention or the Warsaw Convention may be applicable to the liability of the Carrier in respect of loss of, damage or delay to Cargo.  Carrier's limitation of liability in accordance with those Conventions shall be as set forth in subparagraph 4 unless a higher value is declared.

. . .

4.  For carriage to which the Montreal Convention does not apply, Carrier's liability limitation for cargo lost, damaged or delayed shall be 22 SDRs per kilogram unless a greater per kilogram monetary limit is provided in any applicable Convention or in Carrier's tariffs or general conditions of carriage.

[Doc. 31-1 at 5].

To be sure, Defendant's argument is not meaningfully developed.  *See* [Doc. 36 at 3].  While Defendant attempts to "incorporat[e] all of the facts, law, and argument presented in its Motion for Summary Judgment[]," [*id.* at 1], as explained above, *see supra* note 10, Defendant's Motion for Summary Judgment makes no meaningful argument about limiting Plaintiff's liability under the waybill's conditions of contract and does not mention the provision relating to limits of liability "[f]or carriage to which the Montreal Convention does not apply."  [Doc. 31-1 at 5]; *see also* [Doc. 31].  It is not this Court's duty to interpret potentially binding contractual provisions—including the meaning of "SDRs" (or "Special Drawing Rights," *see* [Doc. 31-1 at 10])—without any substantive argument from the Parties.  *Mays*, 739 F.3d at 575.

Nevertheless, Defendant's burden in opposing summary judgment is less stringent than its burden in asking the Court for summary judgment in its favor.  *See Adler*, 144 F.3d at 671.  The Court finds that, by invoking the waybill's conditions of contract and arguing that Plaintiff's damages must be limited by the waybill, Defendant made—

narrowly—a sufficient argument to call the amount of available damages into question. And because Plaintiff fails to respond to this argument, and since "[s]ummary judgment is a drastic remedy" that "should be awarded with care," *Conaway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988), Plaintiff has not met its burden to demonstrate that it is entitled to a $143,315.84 judgment as a matter of law, *see* Fed. R. Civ. P. 56(a). Accordingly, while the Court finds that Plaintiff is entitled to summary judgment with respect to liability on the negligence and conversion claims, and <u>Plaintiff will not be required to prove the elements of liability at trial</u>, Plaintiff is not entitled to summary judgment with respect to damages.

## CONCLUSION

For the reasons set forth in this Order, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Partial Summary Judgment [Doc. 30] is **GRANTED in part** and **DENIED in part**;

(2) DHL Network Operations (USA), Inc.'s Motion for Summary Judgment [Doc. 31] is **DENIED**;

(3) A telephonic Status Conference is **SET** for **February 26, 2025** at **1:30 p.m.** for purposes of setting a Final Pretrial/Trial Preparation Conference and trial in this matter. Counsel for the Parties shall participate using the following dial-in information: **571-353-2301**; Access Code: **783456374**; and

(4) Prior to the telephonic Status Conference, the Parties **SHALL** meet and confer and discuss whether the outstanding question of liability limits is a question of fact for a jury to decide or a question of law for the Court to decide. <u>If the Parties believe it is a question of law for the Court, the Parties shall be</u>

prepared to discuss their proposal as to how that legal issue should be
resolved now that the dispositive motions phase of this case has concluded.


DATED:  February 10, 2025                    BY THE COURT:

                                             _____
                                             Nina Y. Wang
                                             United States District Judge